RECEIVED
AUG 21 2017
CLERK U.S. DISTRICT COURT
SOUTHERN DISTRICT OF IOWA

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Criminal No. 3:17-cr-77 |
| | ) | |
| v. | ) | **INFORMATION** |
| | ) | |
| PAUL MATTHEW BOLGER, | ) | T. 21 U.S.C. § 331(k) |
| | ) | T. 21 U.S.C. § 333(a)(1) |
| Defendant. | ) | T. 21 U.S.C. § 353(b)(1) |
| | ) | T. 18 U.S.C. § 1035(a) |
| | ) | T. 18 U.S.C. § 2 |

**THE UNITED STATES ATTORNEY CHARGES:**

**GENERAL ALLEGATIONS**

At all times material to this Information:

1. Tricare was a health care insurance program of the United States Department of Defense. Tricare provided civilian health benefits for military personnel, military retirees, and military dependents worldwide. The Tricare program provided medical coverage for Uniformed Service members including those who were active duty and reservists that were a part of the following: U.S. Army, U.S. Air Force, U.S. Navy, U.S. Marine Corps, U.S. Coast Guard, Army Reserve, Navy Reserve, Marine Corps Reserve, Air National Guard, Air Force Reserve, and U.S. Coast Guard Reserve and their families. This program also covered survivors, former spouses, Medal of Honor recipients and their families, and others registered in the Defense Enrollment Eligibility Reporting System (DEERS).

2. There were two types of beneficiaries under the Tricare program: (a) Sponsors – active duty, retired and Guard/Reserve members, and (b) Family Members – spouses and children who were registered in DEERS.

3. In order to pay a prescription claim, Tricare required that the item or service being billed must be medically necessary, validly prescribed by a licensed physician, and actually provided to a Tricare beneficiary.

4. Tricare was a "health care benefit program" as defined by Title 18, United States Code, Section 24(b), and a "Federal health care program," as defined in Title 42, United States Code, Section 1320a-7b.

5. Tricare contracted with Express Scripts, Incorporated (ESI) to administer the prescription drug plan of the Tricare program, including the processing and payment of claims.

6. Pharmacy compounding was a practice in which a licensed pharmacist, a licensed physician, or, in the case of an outsourcing facility, a person under the supervision of a licensed pharmacist, combined, mixed, or altered ingredients of a drug to create a medication tailored to the needs of an individual patient.

7. Tricare had strict regulations regarding the use of telemedicine as a method of treating Tricare patients. Tricare did not consider telemedicine a substitute for face-to-face health care except in certain limited situations. One proper use of a telemedicine episode was when the patient could not meet a medical professional face to face because they were in a remote location. Another proper use of a telemedicine episode was a situation in which there was a need for continuity of care with a specific medical professional. A proper telemedicine episode of care must utilize some form of video technology in which the patient and the medical professional could see each other and interact with each other.

8. Under Iowa Code Section 657 - 8.20(155A), "Valid Prescriber/patient relationship – Prescription drug orders and medication orders shall be valid as long as a prescriber/patient relationship exists." Under Iowa Code Section 657 - 8.19(1) "Requirements for a prescription -

A valid prescription drug order shall be based on a valid patient-prescriber relationship. . ." Additionally, under Iowa Code Section 155A.27 "Requirements for Prescription – To be valid, each prescription drug order issued or dispensed in this state must be based on a valid patient-practitioner relationship. . ."

9. During February through May 2015, Defendant was a medical doctor licensed in Delaware, Florida, Georgia, Illinois, Iowa, Kentucky, New Mexico, and Ohio.

10. Defendant knowingly entered into an agreement or understanding with Marketer A. Marketer A would send patient intake forms and prescription forms to Defendant. Defendant would immediately sign the prescription forms without having talked to most of the patients. As of March 25, 2015, Defendant was aware that neither the patients nor the intake forms were being screened by a medical professional prior to being sent to Defendant. Defendant continued to sign the prescription forms which were then filled by the pharmacy. Marketer A paid Defendant approximately $50 per signed prescription form during the relevant time period, resulting in a total payment of $10,950.00.

11. When Defendant signed these prescription forms, he knowingly and willfully attested that "I have reviewed my patient's medical record(s) and determine that the items I have ordered are medically necessary. I agree to comply with state and federal documentation requirements by retaining a copy of this prescription in the patient's medical records." In fact, defendant had not established a patient-doctor relationship with the patients and had not made an independent, professional assessment that the items ordered were medically necessary.

12. Defendant submitted signed prescription forms, containing materially false information, to DCRX a.k.a. Patient Care America (PCA) Pharmacy, who relied on the prescription forms, filled the prescriptions, and mailed the medications to the patient.

13. The pharmacies then billed and Tricare paid for these fraudulent prescriptions for compounded medications. Defendant signed a total of 1375 prescriptions for compounded medications during this time period. Based on the 284 patients and 763 prescriptions that Defendant signed and that were filled by DCRX, Tricare paid out approximately $2,920,353.71.

14. Defendant signed prescriptions for patients in 16 states he was not licensed to practice medicine, including Alabama. In total, 105 patients received medication authorized by Defendant who was not licensed in those states. This cost Tricare approximately $681,000.00.

15. The United States Food and Drug Administration ("FDA") was the agency of the United States charged with the responsibility of protecting the health and safety of the American public by assuring, among other things, that drugs sold to humans were safe and effective for their intended uses and bore labeling containing true and accurate information. FDA's responsibilities included regulating the labels, labeling, distribution, and manufacture of prescription drugs shipped or received in interstate commerce.

16. FDA was also responsible for, among other things, enforcing the provisions of the Federal Food, Drug, and Cosmetic Act ("FDCA"), Title 21, United States Code, Section 301, et seq. Under the FDCA, the term "drug" included articles which were (1) recognized in the official United States Pharmacopeia or official National Formulary or any supplement to any of them; (2) intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man; or (3) intended to affect the structure or any function of the body of man. 21 U.S.C. § 321(g)(1)(A), (B), and (C).

17. Some of the drugs regulated under the FDCA were "prescription drugs." "Prescription drugs" were those drugs, which, because of their toxicity or other potential harmful effects, or the method of their use, or the collateral measures necessary to their use, were not safe

for use except under the supervision of a practitioner licensed by law to administer such drugs, or which were required to be administered under the professional supervision of a practitioner licensed by law to administer such drugs as a condition of FDA approving any such drug to be placed on the market. 21 U.S.C. § 353(b)(l)(A) and (B).

18. The FDCA prohibited the introduction or delivery for introduction into interstate commerce, or the causing of such introduction or delivery, of any drug that was misbranded. 21 U.S.C. § 331(a).

19. The act of dispensing prescription drugs without the prescription of a practitioner licensed by law to administer such drug was an act which caused the drug to become misbranded while held for sale. 21 U.S.C. § 353(b)(1).

20. A drug prescription is invalid under the FDCA unless it is issued in the usual course of professional practice and for a legitimate medical purpose. A valid prescription requires a bona fide physician-patient relationship. Factors that establish the existence of a bona fide physician-patient relationship, and thus a valid prescription, include whether the physician considered the actual needs of the patient, the quantity of the drug prescribed, the type of drug prescribed and for what purpose, the extent to which the physician supervised the issuance of the drug, and whether the physician adhered to prevailing medical standards when issuing the prescription and acted in accordance with generally accepted practices.

21. A "valid prescription" means a written order, that is, directions for the preparation and administration of a medicine, remedy, or drug for a real patient who needs it after an examination or consultation by a licensed practitioner who has a physician-patient relationship with the patient, and that is issued for a legitimate medical purpose in the usual course of professional practice by a licensed medical practitioner. Whether a prescription has been issued in the usual course of a

professional practice for a legitimate medical purpose is determined in part by reference to the laws and regulations of the state in which the physician is licensed to practice medicine and issue prescriptions.

22. Defendant failed to conform to the minimum standard of acceptable and prevailing practice of medicine. Defendant did not obtain a medical history, nor perform a medical interview or physical exam sufficient to establish informed medical diagnosis and provide medical care.

23. Flurbiprofen and Gabapentin are "drugs" within the meaning of Title 21, United States Code, Section 321(g)(1) and are "prescription drugs" as defined in Title 21, United States Code, Section 353(b)(1), and could lawfully be dispensed only upon the prescription of a practitioner licensed by law to administer such drugs. The compound medication that was authorized by Defendant, did not contain controlled substances.

## COUNTS 1-18
### (False Statements Relating to Health Care Matters)
### (18 U.S.C. § 1035(a))

On or about the dates set forth below, in Scott County, in the Southern District of Iowa, and elsewhere, the defendant,

### PAUL MATTHEW BOLGER,

knowingly and willfully made a materially false, fictitious, or fraudulent statement or representations, or made or used any materially false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement, to wit: Bolger falsely attested that "I have reviewed my patient's medical record(s) and determine that the items I have ordered are medically necessary. I agree to comply with state and federal documentation requirements by retaining a copy of this prescription in the patient's medical records," or entry, in connection

with the delivery of, or payment for, health care benefits, by Tricare, a health care program, items or services, to wit: prescription drugs, which occurred on the following dates:

| | |
|---|---|
| 1 | March 26, 2015 |
| 2 | March 28, 2015 |
| 3 | March 30, 2015 |
| 4 | March 31, 2015 |
| 5 | April 1, 2015 |
| 6 | April 2, 2015 |
| 7 | April 3, 2015 |
| 8 | April 6, 2015 |
| 9 | April 7, 2015 |
| 10 | April 8, 2015 |
| 11 | April 9, 2015 |
| 12 | April 10, 2015 |
| 13 | April 13, 2015 |
| 14 | April 15, 2015 |
| 15 | April 16, 2015 |
| 16 | April 17, 2015 |
| 17 | April 19, 2015 |
| 18 | April 20, 2015 |

This is a violation of Title 18, United States Code, Section 1035(a)(2), and Title 18, United States Code, Section 2.

## COUNTS 19-23
### (Introduction of Misbranded Drugs into Interstate Commerce)
### (21 U.S.C. §§ 331(k), 353(b)(1), and 333(a)(1))

On or about the dates set forth below, in Scott County, in the Southern District of Iowa, and elsewhere, the defendant,

### PAUL MATTHEW BOLGER,

introduced and delivered for introduction into interstate commerce and caused to be introduced and delivered for introduction into commerce, as charged in the chart below, each such instance being a separate count of the Information, drugs that were misbranded within the meaning of Title 21, United States Code, Section 353(b), in that the drug was a prescription drug that was dispensed without a valid prescription of a practitioner licensed by law to administer such drugs:

| Count | Rx No. | Approx. Date | Prescription Drug Dispensed |
|---|---|---|---|
| 19 | 111335, 111337 | 3-5-15 | Flurbiprofen dispensed to REv in Enterprise, AL |
| 20 | 111375, 11376, 111379, 111380 | 3-5-15 | Flurbiprofen & Gabapentin dispensed to PS in Smiths Station, AL |
| 21 | 111373, 111377, 111378 | 3-5-15 | Flurbiprofen dispensed to AT in Hueytown, AL |
| 22 | 111425, 111427 | 3-6-15 | Flurbiprofen dispensed to KJ in Gallion, AL |
| 23 | 111282, 111283 | 3-7-15 | Flurbiprofen & Gabapentin dispensed to REd in Fort Mitchell, AL |

This is a violation of Title 21, United States Code, Sections 331(k), 353(b)(1) and 333(a)(1), and Title 18, United States Code, Section 2.

                        Kevin E. VanderSchel
                        United States Attorney

By: */s/ Melisa Zaehringer*

Melisa K. Zaehringer
Assistant United States Attorney
U.S. Courthouse
131 E. Fourth Street, Suite 310
Davenport, Iowa 52801
Tel: (563) 449-5432
Fax: (563) 449-5433
Email: melisa.zaehringer@usdoj.gov