UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | Case No. 3:17-cr-77 |
| v. | ) | 3:17-cr-78 |
| | ) | |
| PAUL MATTHEW BOLGER, | ) | SENTENCING MEMORANDUM |
| | ) | |
| Defendant. | ) | |

The government, by and through the undersigned Assistant United States Attorney, files this sentencing memorandum in anticipation of the sentencing hearing currently set for February 22, 2019, at 9:00 a.m.

TABLE OF CONTENTS

I.   BACKGROUND ................................................................................................... 1

II.  SENTENCING CALCULATION ........................................................................ 2
A.   The PSR should be amended to include patient interview reflecting the potential harm caused by Defendant ........................................................................................ 3
B.   The loss amount is correctly calculated in the PSR .................................................. 3
C.   Restitution should be ordered based on the victim's losses ...................................... 5

III. GOVERNMENT'S RECOMMENDATION ......................................................... 6

I.   BACKGROUND

On August 21, 2017, a 23-count Information was filed under Docket Number 3:17-cr-77 charging Paul Matthew Bolger with False Statements Relating to Health Care Matters (Counts 1-18) and Introduction of Misbranded Drugs into Interstate Commerce (Counts 19-23). (Final Presentence Report, hereinafter "PSR," ECF 21, ¶ 1.) On August 21, 2017, a one-count Information was filed under 3:17-cr-78 charging Paul Matthew Bolger with False Statements Relating to Health Care Fraud Matters. (PSR ¶ 2.) This Information was originally filed in the United States District Court for the Central District of California (Docket Number 17-cr-107).

Pursuant to Rule 20, Bolger consented to the transfer of the case from the Central District of California to the Southern District of Iowa. *Id.* On August 22, 2018, the defendant pled guilty to Counts 1-23 of the Information under 3:17-cr-77 and Count 1 of the Information under 3:17-cr-78. (PSR ¶ 3.)

The government filed several objections to the PSR. (ECF 16.) Specifically, the government requested additional information regarding the investigation be included in the Offense Conduct section of the PSR including patient interviews to show the potential for patient harm cause by the Defendant. *Id.* Additionally, the government objected to not receiving an enhancement under USSG §2B1.1(b)(10)(B), (C); however, the government will not pursue that enhancement. *Id.* The defendant objected to the loss amount. (ECF 17.) Another issue that the Court will have to determine is the amount of restitution to be paid by the defendant.

II.     SENTENCING CALCULATION

In the presentence report paragraphs 48-59 and 111, the defendant's guideline range was calculated as follows:

| | |
|---|---|
| USSG §2B1.1(a)(2) | 6 |
| USSG §2B1.1(b)(1)(J) | +18 |
| USSG §2B1.1(b)(7)(B)(ii) | +3 |
| USSG §3B1.3 | +2 |
| USSG §3E1.1 | -3 |
| Total Offense Level | 26 |
| Criminal History Category | I |
| Guideline Sentencing Range: | 63 to 78 months |

      A.      The PSR should be amended to include patient interview reflecting the potential harm caused by Defendant

The additional information provided by way of the objection filed on November 3, 2017, is necessary to be included in the PSR to show the potential harm to several patients. The information provided in the objection completes the description of the defendant's conduct and should be included as relevant conduct. Bolger was an integral part of this healthcare fraud scheme. While on the surface this scheme appears to only harm the insurance company, however, it could have been damaging to patients. As noted in objection 5, several patients luckily consulted their pharmacist or primary care doctor before use of the prescription authorized by Bolger that could have been harmful to those patients. Additionally, the total amount of loss to Tricare during the pendency of the fraud, puts into perspective Bolger's role in the scheme.

      B.      The loss amount is appropriately calculated in the PSR.

Although the Guidelines are not mandatory, a district court must begin sentencing proceedings by calculating the applicable Guidelines range. *Gall v. United States,* 552 U.S. 38, 49 (2007). "[C]ommentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline." *Stinson v. United States,* 508 U.S. 36 (1993).

Section 2B1.1 of the Guidelines provides that the applicable loss is the greater of the actual loss or the intended loss. U.S.S.G. § 2B1.1 cmt. n.3(A). "Actual loss" means "the reasonably foreseeable pecuniary harm that resulted from the offense," while "intended loss" means "the pecuniary harm that was intended to result from the offense." *Id.* § 2B1.1 cmt. n.3(A)(I)—(ii). Notably, intended loss includes "intended pecuniary harm that would have been

impossible or unlikely to occur (e.g., as in a government sting operation, or an insurance fraud in which the claim exceeded the insured value.)." *Id.* § 2B1.1 cmt. n.3 (A)(ii).

Guideline §2B1.1 provides tiered sentencing enhancements based on the amount of intended loss. In addition to providing tiered enhancements applicable to all theft offenses, the Guideline also provides additional enhancements for healthcare-fraud offenses. USSG §§ 2B1.1(b)(1) (generic-theft offenses), (b)(7) (health-care-fraud offenses). To calculate loss and determine any appropriate enhancement, "the aggregate dollar amount of fraudulent bills submitted to the Government health care program shall constitute prima facie evidence of the amount of the individual loss, *i.e.*, is evidence sufficient to establish the amount of the intended loss, if not rebutted." USSG §2B1.1 cmt. 3(F)(viii).

Here, the actual loss to Tricare includes the monies paid out for the prescriptions authorized by Bolger. Bolger authorized 875 prescriptions (763 to DCRX and 112 to Haoeyou) that were filled and paid out by Tricare in the amount of $3,487,189.71 ($2,920,353.71 and $566,836). The intended loss includes that total as well as the totals from the other prescriptions authorized by Bolger that were eventually reversed, based on the conduct of his attorney. The total of those additional prescriptions was $4,700,000. The total intended loss is appropriately calculated in Paragraph 41 of the PSR as $8,187,189.71.

As for the Central District of California case, Bolger wrote prescriptions resulting in Tricare paying out $566,836. This is the actual loss associated with that case.

It is common knowledge for a medical doctor that the cost of prescription medications are pricey and cost insurance companies billions of dollars yearly. Bolger has experience working as an emergency room physician and most recently as a doctor in the wellness industry. Bolger has

written many legitimate prescriptions in his time as a doctor as well as ordered and dispensed prescriptions to his patients.

During the short time frame that Bolger was involved in this scheme, Bolger authorized 875 prescriptions. For each patient, he authorized a metabolic supplement in addition to several compound medications, certainly driving up the loss to the insurance company. This supplement is a multivitamin that one can get over-the-counter without the necessity of a prescription. Additionally, the prescriptions that he signed authorized refills for each medication prescribed, again, driving up the cost to the insurance company. Bolger admitted to signing upwards of 33 prescriptions in a day. As many as 105 of the patients were in states in which Bolger was not even licensed. (PA, Att. A, ¶ 15.) This alone cost Tricare $681,000. (Id. ¶ 26.)

Bolger communicated with the telemarketers and indicated that he was bored and was waiting for more prescriptions to sign. He told them "I'm a hustler" and "I'll do all 100 [prescriptions] over next two months." In fact, Bolger attempted to work out a deal with a co-conspirator (Robert Paduano) that Bolger would take over the review of the prescriptions in-house, using his staff, and get paid a set monthly fee from Paduano, in order to push more prescriptions through in a month. The behavior of Bolger during the fraudulent scheme shows his intent to sign prescriptions at a high volume, which in turn results in high loss to the insurance company. It is reasonably foreseeable that Bolger knew that the volume of prescriptions he signed would cost the insurance company money.

C. Restitution should be ordered based on the victim's losses

When applicable, the MVRA provides that "a sentencing court 'shall order . . . the defendant [to] make restitution to the victim of the offense.'" *United States v. Frazier,* 651 F.3d 899, 903 (8th Cir. 2011) (quoting 18 U.S.C. § 3663A(a)(1)). "While the amount of loss

calculation looks to the greater of actual or intended loss, the amount of restitution under the MVRA 'cannot exceed the actual, provable loss realized by the victims.'" *United States v. Alexander,* 679 F.3d 721, 731 (8th Cir. 2012) (quoting *Frazier,* 651 F.3d at 905). "The government bears the burden of proving the amount of restitution based on a preponderance of the evidence." *Frazier,* 651 F.3d at 903.

The statute provides that the court shall award as restitution "the full amount" of a victim's losses. 18 U.S.C. § 3664(f)(1)(A). "Congress intended that restitution be a compensatory remedy from the victim's perspective." *United States v. Petruk,* 484 F.3d 1035, 1038 (8th Cir. 2007). Therefore, restitution is limited to "the victim's provable actual loss." *United States v. Chalupnik,* 514 F.3d 748, 754 (8th Cir. 2008). The government has the burden of proof on this issue.

As noted above, the actual amount paid out by Tricare due to the prescriptions authorized by Bolger is $3,487,189.71 and this amount should be paid back to Tricare joint and severally with the other co-defendants. As for Central District of California, the restitution amount is $566,836. As noted in the plea agreement, Bolger agreed to restitution in the amount of *at least* $10,000. This number was arrived at by contemplating the amount of money Bolger received for signing the prescriptions.

III. <u>GOVERNMENT'S RECOMMENDATION</u>

The sentencing statutes inform this Court that it must impose a sentence sufficient, but not greater than necessary, to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the defendant; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in

the most effective manner. 18 U.S.C. § 3553(a)(2).  The Court, in determining the particular sentence to be imposed, shall also consider the nature and circumstances of the offense and the history and characteristics of the defendant. 18 U.S.C. § 3553(a)(1).  The sentence must "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).

The government will ask the District Court to find a final advisory guideline range of Level 26/Criminal History Category I—63 to 78 months' imprisonment. The Government will ask for a sentence within the guideline range.

This is an aggravated case in many aspects. First and foremost, the victim's loss amount is extraordinary. Bolger played a necessary role in the fraud scheme. Bolger was looking for quick, easy money and came upon a scheme that was already in full swing. Bolger had left his career as an emergency room physician and opened his own wellness clinic, which was just getting up and running. His high salary had decreased and he needed to maintain his standard of living.

Bolger was an excellent candidate for the scheme since he was a medical doctor licensed in multiple states. Bolger quickly learned that the prescriptions he was being sent to sign were not legitimate, that a medical professional had not talked to the patient and, many times, the prescription request form was missing important information. Despite that, Bolger signed the prescriptions over and over to the tune of 1,375 times in a four-month period. Bolger did not even care that the patients he signed prescriptions for resided in states in which he was not licensed. Bolger had no intentions of stopping committing this fraud until he was confronted by CBS news who broke the story about his fraudulent activity. In fact, Bolger was working with more than one person, writing prescriptions for more than one pharmacy.  Bolger expressed his

desire to sign a higher volume of prescriptions in a week's time frame, all while knowing he was not conducting himself according to the medical standards he swore to uphold. Further, Bolger attempted to take on a more active role in the fraud and intake the prescription forms to cut out a middle-man, speeding up the process. That never took place due to the news investigation.

Certainly, it is commendable that immediately upon being confronted about committing such crime, he hired an attorney and actively sought to do damage control, asking that the pharmacies that he dealt with to not fill the prescriptions he had authorized, but that had not been filled yet. This act saved Tricare millions of dollars.

Another fact the court should consider is Bolger's behavior while on pre-trial release. The petition filed by the government laid out the allegations that will be in front of this court at the time of sentencing. The conduct of Bolger while on release mirrors the conduct in the underlying case. Bolger again, was attempting to make money by violating the regulations of the medical board and criminal federal laws. Bolger opened three satellite offices in Iowa City, Burlington, and Muscatine, for the primary purpose of distributing controlled substances. Bolger knowingly distributed controlled substances without a DEA registration. Bolger had applied for and was awaiting approval for his office in Iowa City. Bolger, however, never even attempted to obtain a DEA registration in either of the other two offices. Bolger disregarded the laws and attempted to make quick money, meeting with patients for a short visit, every 30 days, dispensing a controlled substance at a cost well above the bulk rate for which he bought the product.

Bolger is a danger to the community. Bolger has a pattern of violating federal laws, in addition to medical regulations. Bolger has shown the court that despite being on pretrial supervision, he will knowingly continue to commit law violations and should be sentenced to a

term of imprisonment. The guidelines adequately address all the sentencing factors that the court should consider, and a sentence within the guideline is warranted.

WHEREFORE, the government prays the District Court consider this sentencing memorandum in determining the final sentence of this defendant.

        Respectfully submitted,

        Marc Krickbaum
        United States Attorney

By: */s/ Melisa Zaehringer*_____
        Melisa K. Zaehringer
        Assistant United States Attorney
        U.S. Courthouse
        131 E. Fourth Street, Suite 310
        Davenport, Iowa 52801
        Tel: (563) 449-5432
        Fax: (563) 449-5433
        Email: melisa.zaehringer@usdoj.gov

CERTIFICATE OF SERVICE

I hereby certify that on February 19, 2019, I electronically filed the foregoing with the Clerk of Court using the CM ECF system. I hereby certify that a copy of this document was served on the parties or attorneys of record by:    X   ECF/Electronic filing
UNITED STATES ATTORNEY
By: */s/ Melisa Zaehringer,* Assistant U.S. Attorney